Filed 4/24/15  P. v. Leatherman CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>EMILY DIANE LEATHERMAN,<br><br>  Defendant and Appellant. | **B238552**<br><br>(Los Angeles County<br>Super. Ct. No. BA365841)<br><br>**B250174**<br><br>(Los Angeles County<br>Super. Ct. No. LA063488)<br><br>**B250175**<br><br>(Los Angeles County<br>Super. Ct. No. LA063160)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>(CHANGE IN JUDGMENTS) |

THE COURT:

It is hereby ordered that the opinion filed herein on March 25, 2015 be modified as follows:

1.  On pages 2-3, after the sentence ending with footnote 2, "Accordingly, we conditionally reverse that conviction."  Delete the word "conditionally" so that the sentence reads:

Accordingly, we reverse that conviction.

2.  On page 21, delete footnote 8 and replace it with:

[Fn. 8] The minute order entered following the sentencing hearing incorrectly states the court imposed a two-year middle term on count 1, rather than one-third the middle term of three years actually identified by the court, and stayed a two-year middle term on count 2, rather than the three-year middle term specified in section 646.9, subdivision (c)(2), and orally imposed and stayed by the court. The abstract of judgment repeats the errors.

In addition, Leatherman argues the misdemeanor conviction for violating a court order in count 3 was based on the same conduct that supported her conviction on count 1 and should have been stayed pursuant to section 654. The Attorney General acknowledges this contention appears to be correct, and we agree. Accordingly, we modify the sentence imposed in the stalking case to an aggregate term of one year six months, rather than two years, to be served consecutively to the sentence imposed in the aggravated assault case if the judgment on the aggravated assault case is reinstated following our reversal and remand, discussed below.

Ordinarily, we would simply order correction of these errors. (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 [record of court's oral pronouncement controls over clerk's minute order]; *People v. Mitchell* (2001) 26 Cal.4th 181, 186-187 [appellate court may correct clerical errors on its own motion or upon application of the parties].) However, in light of our disposition Leatherman must be resentenced on remand, at which time the court can make the appropriate corrections to the new sentence.

3. On page 28, in the last sentence of the second full paragraph, delete the words "must conditionally" so that the sentence reads:

Because a trial court has no jurisdiction to proceed with a case against a defendant without first determining his or her competence in a section 1368 hearing once such a doubt has arisen, we reverse Leatherman's conviction for assaulting Hatamitabrizi.

4.  On page 29, delete the first full paragraph, beginning "On remand, the court must" including footnote 11, and insert the following paragraph in its place, which will require the renumbering of footnote 12 as footnote 11:

Ordinarily, a court must consider on remand whether the record is sufficient to conduct a retrospective hearing pursuant to section 1368 as to the defendant's competence during trial and, if so, proceed with that determination.  (See *People v. Lightsey* (2012) 54 Cal.4th 668, 710-711; *People v. Ary* (2011) 51 Cal.4th 510, 520.) Here, the trial court in the stalking case declared a doubt as to Leatherman's competence just days after the jury convicted her on the aggravated assault count; and, although unable to state a formal opinion, Dr. Mohaupt advised there was evidence in the record she was suffering from psychotic delusions immediately preceding trial on that count. Based on this record, it seems highly unlikely an additional hearing on her competency would yield a different result.  Accordingly,  her conviction is vacated, although the People may decide to retry Leatherman at a time when she is competent to stand trial. (*Lightsey,* at p. 732.)

5.  On page 32, above the Disposition, add section 4 to the end of Discussion:

   4. *Leatherman May Renew Her Request To Withdraw Her Plea in the Criminal Threats Case If She Is Convicted of Aggravated Assault on Retrial; In Any Event, Resentencing Is Required*

Leatherman contends she was induced to plead guilty to the criminal threats charges by the court's representation she would only be subject to an additional year in prison and would receive day-for-day credit reductions for that time under section 2933, subdivision (b).  She now contends she should be allowed to withdraw her plea because the court was mistaken in its description of her anticipated credits:  Under section 2933.1, subdivision (a), she is eligible to receive only 15 percent of those credits because she had been convicted of a violent felony (aggravated assault) within the meaning of section 667.5, subdivision (c).

3

Our reversal of the aggravated assault conviction removes this limitation on the calculation of Leatherman's credits. If the People choose not to retry her on that charge, there will have been no misrepresentation in the inducement of her plea. The condition would be revived only if she were again convicted on that charge. Under these circumstances, the issue is currently moot. Should Leatherman be convicted again of aggravated assault, she may renew this argument by means of a petition for writ of habeas corpus.

In any event, resentencing is required on remand. Our reversal of the aggravated assault conviction requires Leatherman be resentenced whether or not the People dismiss the aggravated assault charge. If she is again tried, resentencing will be required at the conclusion of that trial. On the other hand, if the People choose not to retry the aggravated assault charge, one of the stalking convictions would become the principal term for sentencing under section 1170.1; and her sentence must be recalculated. (See *People v. Bradley* (1998) 64 Cal.App.4th 386, 400-402 [remand for resentencing is appropriate when sentencing choice within trial court's discretion].)

6. On page 32, delete the Disposition and insert the following in its place:

**DISPOSITION**

The judgment entered on Leatherman's conviction for aggravated assault (Case No. B238552) is reversed, and the matter remanded for a new trial at a time when Leatherman is competent to stand trial.

The sentence in Case No. B250175 is vacated. If the People elect not to retry Leatherman on the aggravated assault charge, the court must select a new offense as the principal term and resentence Leatherman on those convictions. If the People elect to retry Leatherman on the aggravated assault charge, she is to be resentenced at the conclusion of that trial. In all other respects the judgment in Case No. B250175 is affirmed.

The judgment in Case No. B250174 is affirmed.

4

This modification changes the judgments.  Appellant's petitions for rehearing in B238552 and B250174 are denied.

_____

    PERLUSS, P. J.               ZELON, J.               FEUER, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EMILY DIANE LEATHERMAN,<br><br>Defendant and Appellant. | **B238552**<br>(Los Angeles County<br>Super. Ct. No. BA365841)<br><br>**B250174**<br>(Los Angeles County<br>Super. Ct. No. LA063488)<br><br>**B250175**<br>(Los Angeles County<br>Super. Ct. No. LA063160) |

APPEALS from judgments of the Superior Court of Los Angeles County, Robert Schuit, Elizabeth Lippitt and Gregory Dohi, Judges.  Reversed in part and affirmed in part.

Gordon B. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Eric J. Kohm, and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent in No. B238552.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent in No. B250174.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jonathan J. Kline and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent in No. B250175.

_____

In these appeals Emily Diane Leatherman seeks reversal of the judgments entered after her April 2011 conviction by a jury of stalking actor John Cusack; her May 2011 conviction by another jury of one count of aggravated assault with associated enhancements; and her June 2013 plea of no contest to six felony counts arising from threats she made while incarcerated against prison officers and her public defender.[1] Leatherman was sentenced in these cases to an aggregate state prison term of 12 years and, as a result, now has four strike convictions within the meaning of the three strikes law.

In each case Leatherman contends the convictions were obtained when she was incompetent and unable to assist her lawyer because of her serious underlying mental illness. On two occasions during the pendency of the trial court proceedings—July 2010 and July 2012—Leatherman was declared incompetent and transferred to Patton State Hospital for treatment. In each instance, after months of treatment, doctors at Patton found her to be competent to stand trial; and she was returned to face the remaining charges. With respect to the stalking trial, sentencing on the stalking convictions and entry of the plea of no contest on the criminal threats charges, we find no abuse of discretion by the trial court. As to the assault case, however, substantial evidence Leatherman was not competent existed at the time her counsel declared a doubt as to her competence during trial; and the trial court abused its discretion by declining to convene a competency hearing under Penal Code section 1368.[2] Accordingly, we conditionally

_____

[1] Leatherman's counsel moved to schedule the oral argument in Case No. B238552 with the arguments in Case Nos. B250174 and B250175 because each case raises similar issues. We granted that motion and resolve all three appeals in this opinion.

[2] Statutory references are to this code unless otherwise indicated.

2

reverse that conviction. We also modify the sentence imposed in the Cusack stalking case to correctly reflect the court's oral pronouncement and to stay one of the misdemeanor sentences imposed, which was based on the same conduct as the felony stalking count. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Criminal Charges Against Leatherman*[3]

    a. *Aggravated assault (Case No. B238552)*

In December 2006 Ali Hatamitabrizi, age 84, was eating at a fast food restaurant near his apartment when Leatherman walked up to him and asked for a dollar. He had never met her before but gave her a five dollar bill. She bought a cup of coffee and returned to his table. After some conversation she asked if she could come to his apartment because it was cold outside. He agreed, and they went to his apartment. He served her some wine and agreed she could stay for one night. She slept on the floor; he slept in his bed.

On the third day Hatamitabrizi told Leatherman she would have to leave. Leatherman refused. After several hours of this standoff, Hatamitabrizi told Leatherman he was going to call the police. According to Hatamitabrizi, Leatherman threatened, "If you call the police, you are dead before the police comes." When he turned to pick up the telephone, she struck him on the head with a wine bottle. The bottle broke, and Hatamitabrizi fell, breaking his hip. Leatherman struck him several times on the head with the broken bottle and then left. Hatamitabrizi's neighbor discovered him and called the paramedics. Hatamitabrizi was treated for head lacerations and a broken hip.[4]

In a February 2010 information Leatherman was charged with one count of assault with a deadly weapon (§ 245, subd. (a)(1)) with special allegations she had inflicted great

---

[3]    Our description of the facts underlying the charges is taken from the People's evidence at trial or, with respect to the criminal threats charges, the preliminary hearing.

[4]    The People were permitted to introduce evidence under Evidence Code section 1101, subdivision (b), that in 2005 Leatherman had similarly induced Jose Ayala to allow her to stay at his home and had then refused to leave. When forced to leave, Leatherman threw a glass bottle at the man's neighbor.

3

bodily injury on a person more than 60 years old (§ 1203.09, subds. (a), (f)) and a person more than 70 years old (§ 12022.7, subd. (c)).

> b. *Stalking John Cusack (Case No. B250175)*

Leatherman began sending letters to Cusack at his home address in November 2005. Some letters came by mail; some were thrown over the fence; others were found by the front door. Single letters were received, as well as multiple letters contained in plastic bags with rocks or screwdrivers in some of the bags to weight them for throwing. In the letters Leatherman repeatedly expressed her sexual interest in Cusack, recounted her history of sexual trafficking, sought to marry him or asked for money. Cusack's security consultant William Mancini testified approximately 200 letters were received in 2005 and 2006. In June 2006 Cusack obtained a restraining order against Leatherman. When Mancini served Leatherman with the restraining order, she threw her drink on him. Mancini, who had provided his telephone number to Leatherman after she repeatedly called Cusack's talent agency (William Morris), also received more than 1,000 calls from Leatherman. The letters and calls continued. On March 30, 2008 Leatherman was found in Cusack's driveway looking into his garage. She was arrested and charged with one count of stalking (§ 646.9, subd. (a)), one count of contempt of court (§ 166, subd. (a)(4)), and one count of theft (§ 484, subd. (a)).

Leatherman pleaded no contest to the stalking count on October 10, 2008; the remaining two counts were dismissed; and her sentence of one year four months was suspended. At the hearing another criminal protective order was issued against Leatherman. Nonetheless, the letters and calls continued. In December 2008 she was arrested in Las Vegas and extradited to Los Angeles. Her probation was revoked; her sentence was reinstated; and she was charged with two felony counts of stalking—one while subject to a temporary restraining order (§ 646.9, subd. (b)) and one of stalking with a prior conviction for stalking (§ 646.9, subd. (c)(2))—as well as two misdemeanor counts of violating a court order (§ 166, subd. (a)(4)).

4

c. *Making criminal threats* (*Case No. B250174*)

On October 22, 2009 Donna Tryfman was representing Leatherman at a preliminary hearing related to the Cusack stalking charges. At the conclusion of the session, while being escorted back into lockup, Leatherman spat on Tryfman, making contact with the back of Tryfman's head. Leatherman also threatened Tryfman, stating, "I should have bashed your head in." Later that day Leatherman phoned Tryfman and left a message stating, "For your safety, you should not be near me." Leatherman also insulted Tryfman and called her a bitch. Tryfman, who feared for her safety and believed Leatherman's hostility was escalating, asked to be removed from the case. The office of the public defender declared a conflict, and a panel attorney was assigned to represent Leatherman.

On June 29, 2009, while being escorted from a hearing, Leatherman spat on Los Angeles County Deputy Sheriff John Maio.

On April 8, 2010 Los Angeles County Deputy Sheriff Edward Gilpin was informed that Leatherman was upset and causing a disturbance. When Gilpin approached Leatherman's cell, she yelled that she was being held without any charges having been filed against her. Gilpin told her there were several outstanding charges and a court date was set for April 13, 2010. Later, when Gilpin was serving dinner to Leatherman, she threatened to kill Gilpin and to "get you and your wife. It won't be hard to find out where you live. I will hunt you down. I am going to blow your kids' brains out then you will know pain. I will find your kids and fucking kill them. I will get a gun and blow your fucking heads off."

A short while later Deputy Angela Johnson was conducting a security check. As she passed Leatherman's cell, Leatherman stated, "I know you are stronger than I am but it won't be hard to find a gun and blow your brains out. It won't be hard to find you; I will just go to where all the niggers are."

Based on these episodes, Leatherman was charged with six felony counts: making criminal threats (§ 422) (counts 1, 5 and 6), battery (§ 242) (count 2), battery upon a

5

custodial officer (§ 243.1) (count 3), and stalking with a prior stalking offense (§ 646.9, subd. (c)(2)) (count 4)).

2. *Pretrial Competency Proceedings*

The record shows that Leatherman was treated for mental illness within the Los Angeles County jail system from at least her February 2009 re-entry into the system. Although she denied she had any history of mental illness, she repeatedly claimed that she had been drugged and was the victim of sexual trafficking before moving from Oregon to Los Angeles in 2004 and that many men in Los Angeles seemed to know her and were aware of that abuse. Jail records indicated multiple episodes of bizarre behavior, including smearing feces and food on herself, head-banging and aggressive behavior toward other inmates and jail staff. She was required to wear a spit mask during transport because of her history of spitting on peers and staff. On three separate occasions in June, November and December 2009 she was transferred to the inpatient psychiatric unit at the Twin Towers Correctional Facility pursuant to involuntary holds under Welfare and Institutions Code section 5150.

By early 2010 the People had filed charges against Leatherman in all three cases. The panel attorney assigned to represent Leatherman after her attack on Tryfman undertook her representation in each case. On February 9, 2010 Leatherman appeared at a pretrial conference in the stalking case fitted with a spit mask. She became disruptive immediately and was escorted from the courtroom. On February 26, 2010 the court declared a doubt as to her competence and appointed psychiatrist Gordon Plotkin to evaluate her competence under section 1368.[5] Dr. Plotkin met with Leatherman on March 27, 2010 and reported she was well-groomed, alert and oriented but could quickly

---

[5] Section 1368, subdivision (a), provides: "If, during the pendency of an action and prior to judgment, or during revocation proceedings for a violation of probation, mandatory supervision, postrelease community supervision, or parole, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." If the defendant's counsel concurs, the court is required to order a hearing on the subject of the defendant's competence. (*Id.*, subd. (b).)

become angry, hostile and agitated. Leatherman also threatened to sue Dr. Plotkin if he did not find her competent. She accused him of being biased and claimed others were persecuting her, including the judge, who, she believed, had declared a doubt as to her competence because the judge was friends with the men who had raped and conspired against her. Dr. Plotkin concluded Leatherman had a major mental disorder within the scope of section 1368, either schizophrenia, schizoaffective disorder or bipolar disorder: "[S]he has complex delusions of grandeur, but more importantly, persecutory delusions . . . [that] infect almost every sentence or answer to a question." Although she was bright and able to understand the nature of the proceedings against her, he concluded, she was incompetent because "she clearly cannot cooperate with counsel. . . . This is not merely an antisocial personality disordered individual who is angry and hostile, but a mentally ill individual who is paranoid. Any attempt to confront her beliefs results in very quick ignition to hostile and angry behavior, as is typical with confronting a paranoid/delusional individual."

Meanwhile, pursuant to a section 1368 order in the assault case, psychiatrist Kaushal Sharma interviewed Leatherman on April 15, 2010. In a one-page letter to the court, Dr. Sharma stated Leatherman was competent to stand trial because she did not present any active symptoms of mental illness and was able to discuss her history and the facts of the case. He noted no bizarre behavior or psychotic symptoms. He attributed her failure to cooperate with her counsel and jail staff to "willful conduct, or personality disorder, rather than mental illness." On April 16, 2010, based on Dr. Sharma's report, the court found Leatherman competent to stand trial.

On April 20, 2010 the court in the stalking case appointed another psychiatrist, Joseph Simpson, to evaluate Leatherman's competence. Dr. Simpson examined Leatherman on May 4, 2010. He concluded she had a chronic, severe psychotic mental disorder, most likely described as, "Delusional Disorder, Mixed Type, with erotomanic and persecutory themes," and appeared "to present a danger to others." According to Dr. Simpson, individuals with such disorders generally do not display the obvious thought disorganization or cognitive impairments of other psychotic disorders and are

7

often able to function at a relatively high level in areas of life not connected to their delusional beliefs. Dr. Simpson attributed the failure of other mental health professionals to detect psychosis to Leatherman's ability to appear quite rational at times. When discussing her delusions, however, "she demonstrates clear evidence of irrational thinking. She has delusional beliefs regarding conspiracies by law enforcement and the court system to prevent the truth about her reported sexual abuse and exploitation (which itself appears to be wholly or partially delusional) from being revealed. She believes that police and the courts are doing this in order to avoid embarrassing celebrities who either participated in the abuse directly or watched it on the Internet." Dr. Simpson further opined "[Leatherman's] delusions prevent her from rationally assisting her counsel in the conduct of a defense" and she "lacks the capacity to make decisions regarding psychotropic medication. If she refuses to accept medication voluntarily, it is appropriate to administer medication involuntarily to restore trial competence."

Informed by Leatherman's counsel of the conflicting competency evaluations in the stalking case, the court in the assault case transferred the case to Van Nuys, where the other two cases were pending. On July 23, 2010 the court sitting in all three cases declared Leatherman to be incompetent to stand trial, recommended she be placed in Patton State Hospital and authorized administration of involuntary psychotropic medication. In a progress report dated November 23, 2010, a hospital psychiatrist reported Leatherman, who had been diagnosed with schizoaffective disorder, bipolar type, was not yet competent to stand trial and should be retained for further treatment. He opined "there is a substantial likelihood that Ms. Leatherman will achieve trial competence in the foreseeable future."

3. *Trial Proceedings Following the February 2011 Certification of Competence*

Leatherman was returned from Patton State Hospital with a finding of competence on February 25, 2011. According to the certifying psychiatrist, Leatherman had become more compliant with her medication and group treatment in December 2010 and had expressed a strong desire to return to court: "She is now clear, coherent, rational, and organized. She does not voice any delusional material, but . . . is high-strung and driven

8

with significant obsessive-compulsive traits." The psychiatrist concluded she was "able to rationally cooperate with her attorney in the preparation and presentation of a defense. . . . [S]he is able to discern which evidence can help her case and which evidence can be used against her. . . . She understands that the best way to aid[] in her defense is by being open and honest with her counselor." After declaring her competence restored, the court set the stalking case for trial and transferred the aggravated assault case back to downtown Los Angeles for trial. Leatherman contends the issues related to her competence are best illuminated by her testimony in each of those cases.

a. *The stalking case*

Trial in the stalking case began on April 21, 2011 before the same judge who had presided over the preceding year's competency review. Leatherman was allowed to dispense with the spit mask but was restrained in her chair with a stealth belt. She was cautioned repeatedly by the court about interrupting proceedings and warned she would be removed if she failed to heed those warnings. After the People had presented their case-in-chief, Leatherman elected to testify. Within moments of starting her testimony, in response to her counsel's question about her attempts to find out about movie stars in Los Angeles, Leatherman explained, "There were a number of men that were coming out and seeking me out." The prosecution's objection to the response was sustained. Nonetheless, throughout her testimony, Leatherman returned to the idea that men had been seeking her out. In response to a question regarding the source of her information about Cusack, she said, "Many men were coming out seeking me out in the industry, telling me they knew of me. I was invited to a lot of people's houses. And when I went to their houses, I recognized having been took there before." She was able to recognize the houses, she claimed, because she had been the victim of sexual trafficking. The prosecution's objection was sustained, and the court instructed the jury to disregard her statements.

Asked to explain her reasons for contacting Cusack, she stated, "As I started to say, many men were coming out to me and I was recognizing places—." The prosecutor interrupted with an objection the testimony was irrelevant, to which Leatherman

9

answered, "This is very relevant." The court sustained the objection and instructed Leatherman not to argue with the court. Leatherman began again, "I met somebody who said that—

> "[Prosecutor]: Objection, Your Honor. Motion—
>
> "[Leatherman]: —that said all these guys knew me and why don't you start writing them who was in the industry.
>
> "The Court: Okay.
>
> "[Leatherman]: —and Steven Spielberg invited me to—
>
> "The Court: Miss Leatherman, please—please refrain.
>
> "[Leatherman]: Well, it's a story that I want to tell, even if this is all I want to tell. It's my part.
>
> "The Court: Miss Leatherman, there's no question pending. All of this is ordered stricken.
>
> "[Leatherman]: That's the whole reason I got up here.
>
> "The Court: Next question, please."
>
> "[Leatherman]: If we've done this all before, why are we doing this again?"

Later during cross-examination the prosecutor asked if she were married to Cusack, and Leatherman answered she was not. The prosecutor then said, "In fact, he has never met you." Leatherman replied, "I think he has. I think maybe in disguise or something I met him because lots of guys were coming out in studio taxis."

At the close of the defense case, out of the presence of the jury, Leatherman interrupted the court to ask whether she had a choice in the jury picking the penalty. When the court explained it, rather than the jury, would set the penalty if there was a conviction, Leatherman asked, "Well, do you think John Cusack will come in and get me out of here? This is the first time I am thinking right." At the close of the People's rebuttal case, Leatherman again interrupted the court: "I gave [my counsel] many questions to ask, . . . like three pages' worth. She didn't ask any of them, not one of them. She had brought up in my opening argument about rapes and me going to the police and they laughed at her, dah, dah, dah. I was hoping she would tie that into my story and—not the story—but the truth of why I felt kind of the need to control a

10

situation when people are controlling me. And I possibly could have medical technology in my neck. And I know you guys roll your eyes and you frown at that and you call it a mental illness, . . . maybe it's not."

As the jurors were leaving the courtroom after having been instructed on the charges, Leatherman blurted, "They're actors. Juror Two looks like an actor. . . . This isn't fair to me. . . ." She continued, "I wanted love because a bunch of men took me around and raped me. My own lawyer won't bring that up. . . . [M]y lawyer is being a real bitch, too."

On April 27, 2011, after deliberating just over an hour, the jury convicted Leatherman on all counts.

b. *The assault case*

Trial on the assault charge began on May 18, 2011 before a judge who had no previous experience with Leatherman. Before allowing the People to call Jose Ayala to testify about a 2005 incident in which Leatherman had induced Ayala to let her stay at his home and had become violent when forced to leave, the court conducted a hearing under Evidence Code section 402 to determine whether the testimony was admissible under Evidence Code section 1101, subdivision (b). When Leatherman's counsel began her cross-examination of Ayala, Leatherman interrupted to challenge Ayala's account of their initial meeting. The Court admonished her:

> "The Court: This is probably as good a time as any since there's no jury. Miss Leatherman, you have to allow your lawyer to do her job without—
>
> "[Leatherman]: Remember the conversation we had?
>
> "The Court: Stop just for one second.
>
> "[Leatherman]: She's going to lose the case on me.
>
> "The Court: You have to allow your lawyer to do her job. You can't constantly be animated and be talking to her while she's trying to—
>
> ". . . .
>
> "The Court: Miss Leatherman, you need to understand something. You will have the ability to do whatever it is you'd like when you get on the witness stand. But while this witness is on the stand, you can't be animated and distract your lawyer. It's going to prevent her from doing her job.

11

"[Leatherman]: But I don't want go through three cases and not have the crimes that happened to me brought up. That's what happened so far. She words her questions so it won't bring it up.

". . . .

"The Court: You have a right to be here at your trial, but that right is not absolute. If you continue to act out, you're going to end up basically sitting in the lockup while your trial is going on. I want you to be here for your trial. I want you to watch the witnesses, and I want you to be able to see what's going on. Yet, if you continue to act out, you're going to end up being excluded from your own trial. You understand what I'm saying?

"[Leatherman]: I understand. But I don't feel I've had fair trials because my lawyer, who you told me I'm supposed to cooperate with, will not bring in the truth of me being sexually trafficked and men coming out to me.

". . . .

"The Court: You're not listening to me, though. What you're doing is you're saying, 'Yeah, I'm listening to you,' and then you're saying whatever it is you want to say anyway. You can't do that.

"[Leatherman]: I don't want to go through three trials sitting quiet, and I get blamed with everything. This is a story. She's going along with it because she's not asking the right questions to show my story.

"The Court: Understand that she's going to cross-examine the witness now, and you need to remain silent and let her do her job. If you—

"[Leatherman]: I feel she's working for the police or these guys. I don't feel she's working on my behalf at all.

". . . .

"The Court: Here's what we're going to do. I don't want to argue with you now. What I'm going to do is we're going to continue with the proceedings, and you are either going to behave or not. If you don't behave, you're going to end up in lockup.

"[Leatherman]: All I want is a chance to speak and tell the truth.

"The Court: You know something, you'll get that chance, but you won't get it while this witness is on the witness stand.

"[Leatherman]: And I won't get it if she doesn't ask the right questions.

"The Court: I'm no longer going to argue with you, Miss Leatherman. You are going to have to remain quiet.

"[Leatherman]: All right."

After further argument on the People's motion to admit Ayala's testimony, the court once again admonished Leatherman. When the court finished, Leatherman again disparaged her counsel for failing to ask the right questions: "She doesn't want to because she knows some of the guys' houses. She's an East Coast girl. She's playing both sides." After a colloquy with the court, she said, apparently to counsel, "I've been in jail for a long time because of you. You should be ashamed of yourself. Disgusting. You're all like corroded, your hands and everything."[6]

In another instance, the court admonished Leatherman about speaking out in front of the jury:

"The Court: . . . I understand from court staff that you were speaking out in front of the jury while I was conducting a chambers conference with the lawyers. I want to admonish you once again not to do that. Please don't say anything. Don't be disruptive or say anything or be animated in front of the jury.

"[Leatherman]: I don't want to do this ever again.

"The Court: I understand that, but it's—

"[Leatherman]: Your family or hers or east coast people—

"The Court: It's really important—

"[Leatherman]: —The police. My head's not going to be erased, and we're not going to do this again.

"The Court: It's really—

"[Leatherman]: This is the last time. All the characters involved, last time.

"The Court: One more time, listen to what I'm saying. It's really—

"[Leatherman]: Listen to what I'm saying too.

"The Court: You have to understand something. I'm in charge of the courtroom and you are not.

"[Leatherman]: I know, but I'm in charge of my own life.

---

[6]     When Ayala reached the end of his testimony, Leatherman erupted in front of the jury: "I was tooken to his house years before . . . and raped." The court attempted to interrupt her, but she continued, "That's why he came . . . . It's going to come up. I was raped by this guy." The court directed the jury to leave the courtroom and then ordered the bailiff to remove Leatherman as well.

13

"The Court: You must listen to what I'm telling you, because if you choose to act out, I'm going to exclude you.

"[Leatherman]: I've heard you.

"The Court: I want to make sure you heard me and you understand it's really going to happen. Please be careful. Don't do that again. We'll take a break for lunch, and we'll see you at 1:30.

"[Leatherman]: (Addressing counsel) Maybe you could ask some questions that would be good for me this time like the judge said."

When the parties returned from the lunch break, Leatherman's longtime counsel declared a doubt as to her competence. Leatherman immediately interrupted her, insisting she was "fine" and counsel had "caused the 1368." After the court admonished Leatherman to let her lawyer speak, counsel stated: "And based upon these things that the court has seen for themselves, I feel duty bound to declare a doubt as to her competency. She is going to essentially convict herself just based on her own behavior. She's addressed the jury inappropriately, she's repeatedly disrupted this court, and she's delusional." Leatherman interrupted, declaring, "You're not a psychologist." Addressing the court, she said:

"[Leatherman]: . . . [Defense counsel] has been my attorney now for almost two and a half years. I've been in custody for two and a half years without being convicted of a crime. She has showed me over and over and repeatedly that she wants me to lose the cases. Like I've said, she'll say one thing, and then when we go in, she'll do another. I can't stop her from doing that. I have tried to get her to write down what she's going to say. She refuses so that I'd have any proof.

"The Court: We're not here to discuss the situation—

"[Leatherman]: She tries to get me angry. Then this is what she does.

"The Court: I want to focus you on what's important here. This is not an opportunity for the two of us to discuss her conduct or your relationship with her.

"[Leatherman]: I think she is a drug addict. I really do.

"The Court: The issue, Miss Leatherman, is whether or not you are competent to stand trial.

"[Leatherman]: I am. I've—let me just finish really quick. I've tooken—over the past two and a half years tooken five to eight competency tests. The first three to four were competent, and she still would find reasons to put it off. Then she got some quirky guys, two of them, to say not competent when I answered exactly the

14

same. So she got her way. Then she held it off for a long time. Now I've been found competent again two or three times. She's tried to send another evaluator before in case. She must be getting paid pretty good to keep me in very long. So I didn't see that person. I'm not going to take any more psychological tests. I didn't know I had a choice, but now I do.

"The Court: It's really just a question about your competency.

"[Leatherman]: I am competent. I understand what's going on.

"The Court: That's all—

"[Leatherman]: And I understand she wants to screw me over. Otherwise she would do her job well. I don't understand why she won't.

"The Court: That's not the issue.

"[Leatherman]: But it is to me.

"The Court: What the issue is to you perhaps and the issue is to me may be two different things, but right now I have a legal issue to decide, and that is whether or not I'm going to declare a doubt about your competency. Given what I know, I'm not prepared to declare a doubt at this time. I think I would concur with [defense counsel] that Miss Leatherman is difficult to work with. There's no question about it. She has acted out in front of the jury. I have admonished her on numerous occasions about that. But at this point I'm not prepared to declare a doubt about her competency. . . . [S]he may be somewhat obstreperous and may be difficult in court, but that does not mean that I have a doubt about her competency."

Testifying in her own defense, Leatherman said Hatamitabrizi had approached her at the restaurant, and they talked for several hours. He seemed like a nice man, and he seemed to know her: "But, once again, this is happening every day to me. I was meeting men that knew me. And I had been exploited on an internet site and drugged up and dragged around and raped." She accompanied him to his apartment in part to see if she remembered it. The apartment was cluttered; but he did not want her to leave, and she stayed for three nights. On the third day she spent at the apartment, they were drinking red wine; and he began to make sexual innuendoes. He told her he knew her from Portland and an internet site. Eventually, he approached her and touched her breast area. She pushed him away, and he fell. She left the apartment and did not know he had been injured. She also testified she tried to report the incident to the police, but they refused to take a report. Explaining her failure to contact someone in the building, she stated, "I didn't go to the neighbors because I had been going to the police for years and they

15

weren't listening to me. I had been meeting people that knew me and houses I had been dragged to and I had proof of it, and they were not listening to me or taking reports. If anything, they were telling me to watch out, I'd be put in jail, and sending out people like Ali Hatami to befriend me and give me a place to stay instead of taking reports for me and going out to the guys' houses I was took to. Like Jose Ayala, I was took to his house. I remember it. Ali Hatami—I'm going to be honest—I don't remember being dragged to his apartment years before. But I think he knew this network of guys that did this. I think he probably saw pictures of me or something is what I suspect. He was an ex-police officer."

Leatherman later testified she had not wanted to stay at Hatamitabrizi's apartment but had accompanied him to see if he was one of the men who had abused her: "The only reason I did it is because these guys were popping up every day. And I just met people like Jose Ayala, people I knew for sure houses I was took to. And I knew I couldn't go to the police because they were like basically telling me I couldn't, so I wanted to see. I was like, okay, he's acting like he knows me. He's another one. Let's see if I've been dragged there. To be honest—I'm not going to lie—I don't feel that I was took to that apartment he lives in now. I think I was took to a house he lived in in Anaheim. And I was dragged all around Anaheim too."

As Leatherman got off the stand, she asked the judge, "What about the crimes that have happened to me?" She continued to speak despite admonitions from the court. "I don't feel I've had my story told. You told me I would have a chance to speak." After the jurors had left the courtroom, she continued, ". . . You know what? Honestly, Judge, I want to have my life back. I want to have love in my life. How can I have love in my life if I'm doing this again? Do you have a family with children and a spouse? That's what I want. . . . Maybe if you guys could be nice to me, maybe if you listened to my side, maybe if you guys weren't a bunch of jerks that all know each other and maybe if you let me go and have love in my life then we wouldn't be doing this. Maybe I wanted to be going to people's houses that knew me. They weren't coming out and inviting me there. Fucking sickos."

Leatherman erupted again during the prosecutor's closing argument. As the court ordered her to go to lockup, she berated her lawyer for failing to use the proof she had collected of her abuse by the police: "[My lawyer] knows that I went to the police like 20 to 30 times. . . . The police weren't doing the right thing. . . . [T]hey are sending out people they knew to give me a place to stay for the night because they ruined my life by . . . having me lose my apartment and all my things. You're not going to bring up any of that? . . . She tells me . . . that's not relevant. It's crazy talk." She then launched into an extended tirade against her lawyer, the judge and the prosecutor, after which she was excluded from the courtroom.

On May 26, 2011, the jury deliberated just over an hour before convicting Leatherman on the aggravated assault charge and finding true the special allegations related to Hatamitabrizi's age. During the reading of the verdict, Leatherman again disrupted the proceedings and was removed from the courtroom.

4. *Posttrial Competency and Sentencing Proceedings*

On June 1, 2011 Leatherman appeared for sentencing in the stalking case before the judge who had extensive experience with her competence issues. At that hearing her counsel declared a doubt as to Leatherman's competence, the court concurred and appointed Stephen Mohaupt, a forensic psychiatrist, to examine her.[7] Because Leatherman refused to attend his examination, Dr. Mohaupt reviewed her medical records from the date of her return from Patton to the date of his report. According to those records, Leatherman had been compliant with her psychiatric medications. Other than an incident of throwing milk at her cell door, her charted behavior was "mostly reasonable." The chart contained the following entry written by the jail psychiatrist on May 9, 2011, approximately two weeks after her conviction on the stalking charges and two weeks before her conviction on the assault charge: "Patient was met informally before this session when she shared her being sexually trafficked to the house of various celebrities, film producers and police officers. This occurred for some time without her

---

[7]     Sentencing in the aggravated assault case was also continued pending the outcome of the competency proceedings.

17

knowledge until these memories came back piece by piece and she then reported this to police. She was angry for her lawyer contemplating bringing up her mental health history since she does not believe in mental illness and believes that her allegations are true and that she will be victorious if her lawyer pursues the case correctly. . . . She asked if I had read something in her chart of concern? Her idea about possibly being thought of as a biblical figure by a certain group leader to them trying to control her was shared. Patient became agitated and argumentative. . . . She feels that getting medical and mental health involved with criminally charged people is not because the county cares for inmates but because it has . . . hidden agendas such as experimentation . . . ."

Dr. Mohaupt concluded, "This progress note documents delusion and paranoid thoughts of such an extent that if Ms. Leatherman continues to hold these belief[s] they would interfere with her ability to cooperate with counsel. Since Ms. Leatherman did not come to my interview I am not able to render an opinion regarding her competency but . . . I would recommend that Ms. Leatherman receive an additional competency evaluation."

Sanjay M. Sahgal, also a forensic psychiatrist, was appointed in August 2011 to evaluate Leatherman's competence to stand trial on the charges of making criminal threats as well as for sentencing on the stalking and aggravated assault convictions. Dr. Sahgal, who had evaluated Leatherman in 2009 and found her incompetent, unsuccessfully attempted to interview her on four occasions over the course of two months at the Century Regional Detention Facility. On November 28, 2011 she agreed to be interviewed. At the time of the interview Leatherman appeared calm and alert, with good eye contact, and did not appear to be significantly depressed, anxious or manic. Her thoughts were linear and coherent, and she agreed her prior fixation with Cusack was delusional. Based on this interview Dr. Sahgal wrote, "Ms. Leatherman has a history of psychosis and mood instability. At this time, she is being prescribed psychotropic medication and appears to have improved significantly. She demonstrates an understanding of her legal predicament. Moreover, she appears to be capable of rationally cooperating with her attorney to assist with her defense. I believe that

18

<u>Ms. Leatherman **is** currently mentally competent to stand trial.</u>  However, her mental status is rather fragile and, if she doesn't take her medications consistently and attend to follow-up care, Ms. Leatherman will very likely experience a deterioration of her mental status."

After receipt of Dr. Sahgal's report, the courts in both the aggravated assault and stalking cases declared Leatherman competent.  Leatherman's counsel filed motions for new trials in each case, which were denied.  Sentencing on the assault conviction was set for December 5, 2011 but was continued when Leatherman refused to leave her jail cell.  On December 14, 2011 she appeared and was sentenced to nine years in state prison, consisting of the upper term of four years for aggravated assault with a five-year enhancement pursuant to section 12022.7, subdivision (c).

At a hearing on December 20, 2011 the parties discussed a possible resolution of the criminal threats case, which had been trailing pending resolution of Leatherman's competence.  Leatherman told the court she had not realized how "permanent" the sentencing on the assault conviction would be and asked if the court could "take it and put it into some kind of deal."

On January 18, 2012 Leatherman's counsel again declared a doubt as to her competence.  The court appointed Dr. Gregory Cohen to evaluate Leatherman.  After reviewing her psychiatric history Dr. Cohen reported, at the time of his interview with her, Leatherman "was substantially mentally impaired.  She stated at the outset of the interview that she would not have come to the [interview] if she knew that a psychiatrist was there to interview her.  She then stated that she hated her attorney and that she had fired her.  The defendant then became agitated and began yelling and screaming. . . .  She stated, 'You can only write down that I am firing my attorney.  You are a fucking asshole!' . . . She also demonstrated pressurized speech. . . .  She continued to yell and use obscenities, and she was unresponsive to attempts to redirect her. . . .  She expressed paranoid delusions that I was going to harm her.  Her thinking was highly irrational and illogical.  She was completely uncooperative."  Based on this interaction, Dr. Cohen concluded Leatherman was "presently acutely psychotic and manic. . . .  She has

19

presently decompensated mentally. She has been irrationally angry and agitated and has refused to cooperate with her attorney. She has demonstrated paranoid delusions . . . [and] believes her attorney is working against her, is an 'actor', and is in 'cahoots with the DA.' She is unable to have a meaningful conversation with her attorney due to delusional thinking, agitation, mania, and poor judgment. . . . [I]n my opinion she is not competent to stand trial."

Based on this report, all criminal proceedings against Leatherman were suspended, and she was transferred to a series of psychiatric placements concluding in Patton State Hospital. On April 17, 2013 the court received certification from Patton that Leatherman's competence had been restored, and she was declared competent to stand trial on May 8, 2013.

In a hearing that began on June 21 and continued on June 24, 2013, the court allowed Leatherman to question at length a proposed plea of no contest to the six counts contained in the criminal threats case. The focus of Leatherman's colloquy with the judge was how she could be released from custody "soon." Despite having been sentenced to nine years in prison for the aggravated assault conviction and facing additional sentences on the stalking and criminal threats convictions, Leatherman continued to request the court for assistance in "wrapping up" her cases in return for a mental health commitment, as she believed the prosecutor had once offered. She also insinuated she had been entrapped by Mancini and the police in Las Vegas and argued, "[I]f that's the truth, then this is illegalness. What can I do about it? I didn't get a fair trial." She added, "I feel like I have to take the deal, but I feel like I'm screwing myself. If I had appropriate counsel or if it was done fair, that I would actually maybe win the trial." She interrupted the court's voir dire on the plea on several occasions and wondered if she should "hookup with some rich guy or go to my parents and have them buy me a lawyer and we can rectify all this. That's why I was hoping we can do some better deal now instead of four years that would happen." She then asked the court whether it would allow her to represent herself. The court denied that request.

20

At the continued session on June 24, 2013 the court, sitting in the stalking case, sentenced Leatherman to a determinate term of two years in state prison, consisting of one year for stalking while subject to a temporary restraining order (count 1) (one-third the middle term of three years, consecutive to the aggravated assault sentence as the principal term), three years for stalking with a prior conviction for stalking (count 2) (stayed under § 654) and six months on each of the two misdemeanor convictions for violating a court order (counts 3 and 4) (consecutive to count 1).[8]

Turning to the criminal threats case, the court allowed Leatherman to continue her questioning about the plea, which she alternately rejected and embraced. In support of her claim her offenses had been minor, she spoke at length about a deputy sheriff who had given her a cupcake after the previous hearing. She found him "kind of attractive," had written him letters in the past and interpreted his gesture as proof he did not believe she was a stalker. Asked by the court to focus on the plea rather than her personal life, she continued: "I'm saying I don't want to do a trial. . . . [My lawyer is] very good at making me lose anyways . . . what's the point?" Advised the plea would require her to remain on parole for three years, she asked, "You can date a cop when you're on parole,

---

[8]   The minute order entered following the sentencing hearing incorrectly states the court imposed a two year middle term on count 1, rather than one-third the middle term of three years actually identified by the court, and stayed a two year middle term on count 2, rather than the three year middle term specified in section 646.9, subdivision (c)(2), and orally imposed and stayed by the court. The abstract of judgment repeats the errors. We order their correction. (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 [record of court's oral pronouncement controls over clerk's minute order]; *People v. Mitchell* (2001) 26 Cal.4th 181, 186-187 [appellate court may correct clerical errors on its own motion or upon application of the parties].)

On appeal Leatherman argues the misdemeanor conviction for violating a court order in count 3 was based on the same conduct that supported her conviction on count 1 and should have been stayed pursuant to section 654. The Attorney General acknowledges this contention appears to be correct, and we agree. Accordingly, we modify the sentence imposed in the stalking case to an aggregate term of one year six months, rather than two years, to be served consecutively to the sentence imposed in the aggravated assault case if the judgment on the aggravated assault case is reinstated following our conditional reversal and remand, discussed below.

21

correct?" As the court pressed Leatherman to make a decision, Leatherman said, "There's one last thing I want to tell you. I probably won't do the parole. I would get out . . . and run, and I would hide. . . ."

After extensively reviewing the consequences of the plea with her, including the calculation of pre- and post-sentence credits and the three additional strikes a plea would entail, the court accepted Leatherman's plea of no contest to all six counts in the first amended information. The court rejected the People's request for an additional six year prison term and, using the nine year term imposed for the aggravated assault conviction as the principal term, sentenced Leatherman to a consecutive term of one year in state prison for stalking with a prior stalking offense (one-third the middle term) (count 4), plus concurrent two year terms on each of the three charges of making a criminal threat and battery on a custodial officer (counts 1, 3, 5 and 6), plus a concurrent six-month county jail term for simple battery (count 2).

## CONTENTIONS

In all three appeals Leatherman contends the trial court erred by failing to conduct section 1368 competency hearings during the respective proceedings and, consequently violated her due process right to be competent at trial and when entering a plea. She contends her statements and testimony during those proceedings are proof of her delusional mindset, which prevented her from comprehending the true impact of the proceedings and assisting her lawyer.

In the assault case Leatherman also contends the trial court abused its discretion in permitting the People to present evidence relating to the uncharged incident involving Jose Ayala and the prosecutor's improper cross-examination violated her right against self-incrimination.

In the stalking case Leatherman additionally contends the trial court erred by refusing to instruct the jury pursuant to CALCRIM No. 3428 that her mental state could be considered when determining whether she acted with specific intent and abused its discretion when it denied her motion to continue the trial to engage a psychologist to testify on her behalf. Alternatively, Leatherman contends her counsel provided

22

ineffective assistance by failing to retain an expert witness to testify about her mental state. She also contends the sentence on count 3 (a misdemeanor violation of a restraining order) should have been stayed pursuant to section 654, a contention the People concede.

In the criminal threats case Leatherman contends her no contest pleas were induced by the misrepresentation she would receive day-for-day credits and the case should be remanded to allow her to withdraw her pleas.

**DISCUSSION**

1. *Principles Governing Competency Proceedings*

"A person cannot be tried or adjudged to punishment . . . while that person is mentally incompetent." (§ 1367, subd. (a); see *People v. Sattiewhite* (2014) 59 Cal.4th 446, 464 ["""[b]oth the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent""""] (*Sattiewhite*); *People v. Rogers* (2006) 39 Cal.4th 826, 846 [due process prohibits trying or convicting defendant who is mentally incompetent].) A defendant is incompetent if it is proved, "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a); see *Sattiewhite,* at p. 464; *People v. Lawley* (2002) 27 Cal.4th 102, 131.)

"'Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.] . . . Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations.'" (*Sattiewhite, supra,* 59 Cal.4th at p. 464; accord, *People v. Rogers, supra,* 39 Cal.4th at p. 847.) Pursuant to section 1368, if the trial court and defense counsel express a doubt as to the defendant's competence to stand trial, the court must hold a competency hearing to

23

determine the question of the defendant's mental competence in accordance with the specific procedures mandated by section 1369.[9] (See, e.g., *People v. Hale* (1988) 44 Cal.3d 531, 541 ["once a doubt has arisen as to the competence of the defendant to stand trial, the trial court has no jurisdiction to proceed with the case against the defendant without first determining his competence in a section 1368 hearing"].)

Standing alone, however, defense counsel's expressed belief that a defendant is mentally incompetent does not automatically trigger a section 1369 competency hearing. "Counsel's assertion of a belief in a client's incompetence is entitled to some weight. But unless the court itself has declared a doubt as to the defendant's competence, and has asked for counsel's opinion on the subject, counsel's assertions that his or her client is or may be incompetent does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing." (*People v. Mai* (2013) 57 Cal.4th 986, 1033; accord, *Sattiewhite, supra,* 59 Cal.4th at p. 465.) "By the same token, and absent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial." (*Mai,* at p. 1033; accord, *Sattiewhite,* at p. 465.)

Under the circumstances presented here, when a defendant has already been found incompetent and, through treatment, restored to competency, "a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153; accord, *People v. Taylor* (2009) 47 Cal.4th 850, 864.) Nonetheless, a court has "'a continuing duty to monitor for substantial evidence' of defendant incompetence" (*People v. Mixon*

---

[9]     Section 1369, subdivision (a), provides: "The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant. In any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof."

(1990) 225 Cal.App.3d 1471, 1485) and "may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state" (*Jones,* at p. 1153). If at any time after the restoration hearing "'a doubt [arises] in the mind of the judge as to the mental competence of the defendant' (§ 1368, subd. (a)), the judge has a duty to initiate mental competency proceedings . . . ." (*Mixon,* at p. 1485.)

   2. *Substantial Evidence Supported a Finding of Doubt as to Leatherman's Competence During the Assault Trial*

We have considered these cases together because, when viewed chronologically, the pattern of Leatherman's mental incapacity more clearly emerges. In February 2011 when she returned from Patton State Hospital, several questions had been resolved. First, there was no longer any question Leatherman was seriously mentally ill. Moreover, the symptoms of her illness had been fully described: According to the Patton report certifying the restoration of her competence, she had been diagnosed with a "schizoaffective disorder, bipolar type," a delusional disorder that was not necessarily accompanied by cognitive impairment. In other words, at times she could appear lucid and rational although, under stress, her affect could become impaired and her paranoia more patent. At the time of her admission to Patton in September 2010, she had "demonstrated clear evidence of irrational thinking" and delusional and paranoid beliefs, most notably when discussing her pending legal charges. According to a November 2010 progress report, she remained agitated and confrontational and displayed paranoid and bizarre delusions (including her repeated complaints about a device inserted in the back of her neck). After further treatment, however, which included a structured, supportive environment, individual and group activities and a medication regimen, she became more compliant, less anxious and no longer voiced delusional beliefs although, the evaluator cautioned, she continued to have obsessive thoughts. In light of this and previous evaluations, as well as her conduct at the stalking and aggravated assault trials, we review the trial court's rulings on her competency for an abuse of discretion. (See *People v. Ramos* (2004) 34 Cal.4th 494, 507.)

25

a. *The stalking trial*

Leatherman argues the symptoms that led to the finding of incompetence "were in abeyance after restoration proceedings" but returned during trial of the stalking charges. That Leatherman's delusional beliefs, by which several psychiatrists who had examined her had measured her competence, returned during the Cusack stalking trial and were manifest during the assault trial is undisputed.[10]  Based solely on the Patton competency restoration report, the reappearance of these symptoms constitutes a change of circumstances sufficient to trigger competency review.

The existence of those delusional thoughts, however, does not alone constitute substantial evidence Leatherman had, once again, become incompetent.  (See, e.g., *People v. Weaver* (2001) 26 Cal.4th 876, 952-954 [delusional behavior and statements at trial insufficient to raise doubt as to competence]; *People v. Welch* (1999) 20 Cal.4th 701, 742 ["'more is required to raise a doubt than mere bizarre actions [citation] or bizarre statements'"].)  The critical issue is whether her mental illness prevented her from assisting her attorney in her defense.

There is no evidence Leatherman's mental condition during the stalking trial prevented her from assisting her counsel.  In fact, Leatherman, despite her delusional statements and difficulty restraining her comments while on the stand, appeared to cooperate with her counsel until the end of the trial.  At that time her counsel requested the court exclude Leatherman from the reading of the verdict, a request the court granted: Both the trial judge and defense counsel recognized she had become significantly more agitated at the close of argument.  Acknowledging her concern about Leatherman's mental state, defense counsel raised the possibility of declaring a doubt as to her competence, but deferred to the court's decision to proceed with the verdict.  Thus, other than concurring that Leatherman should not be present for the reading of the verdict, her

---

[10]     In closing argument the prosecutor stated:  "Lastly, as to counsel's claim that the defendant had this delusional thinking, yes, there is some delusional thinking.  She thought that Mr. Cusack was going to fall in love with her all these years.  That's delusional, but it's only an explanation for her behavior.  It's not a legal excuse or defense."

26

counsel did not complain on the record that her ability to represent Leatherman had been compromised by her client's mental state. The trial court, therefore, did not abuse its discretion in failing to declare a doubt as to Leatherman's competence.

b. *The assault trial*

The assault trial began with the testimony of Hatamitabrizi, followed by the neighbor who had assisted him after he was injured. After a weekend break, the court conducted the Evidence Code section 402 hearing—outside the presence of the jury—to determine whether Ayala would be allowed to testify. As soon as Ayala began to testify, Leatherman interrupted to challenge his account of their meeting. When the court admonished her to be quiet and to allow her lawyer to do her job, Leatherman argued with the court, insisting her history of sexual trafficking and previous rape by Ayala was essential to her defense. She accused her lawyer of failing to ask her the right questions in her previous trial. After challenging the judge, Leatherman turned to her lawyer, complained she had been in jail a long time because of her and insulted her. She later interrupted Ayala's testimony in front of the jury, claiming he had taken her to his house and raped her. Admonished again by the court, she turned to her lawyer and said, "Maybe you could ask some questions that would be good for me this time like the judge said."

At this juncture, Leatherman's counsel declared a doubt as to her competence, stating, "She is going to essentially convict herself just based on her own behavior. She's addressed the jury inappropriately, she repeatedly disrupted this court, and she's delusional." Leatherman responded by again criticizing her counsel and accusing her of wanting her to lose the cases. She insisted she was competent. The court declined to declare a doubt as to her competence, and the trial resumed. In Leatherman's own testimony, she repeated her accusations against Ayala and claimed Hatamitabrizi also knew her and had taken her to a house in Anaheim. After concluding her testimony, she challenged the court in front of the jury, asserting she had not yet been able to tell her story. She had yet another outburst during the prosecutor's closing argument and berated

27

her lawyer again for failing to elicit her history of sexual trafficking and abuse by the police. She was excluded from the remainder of the trial.

This pattern of behavior shows that, by the time of the assault trial, the stress associated with the stalking trial and her frustration with her counsel's performance had caused Leatherman to decompensate from the fragile competence she had attained while at Patton State Hospital. Indeed, less than a week later, the judge presiding over the stalking trial declared a doubt as to her competence and ordered she be examined. While Leatherman's subsequent failure to cooperate with Dr. Mohaupt prevented him from expressing a formal opinion as to her competence, he observed that, just two weeks before the assault trial began, a jail psychiatrist had noted in her medical file she was experiencing delusions that, if maintained, Dr. Mohaupt concluded, would impede her ability to assist in her defense. In other words, existing clinical evidence in her file would have provided substantial evidence of her lack of competence.

Inevitably, our conclusion the court should have declared a doubt as to Leatherman's competence is guided in part by hindsight. The record contains ample evidence of Leatherman's gradual decompensation after her return from Patton in February 2011. This deterioration was more apparent to the judge sitting in the stalking trial largely because that judge had presided over previous section 1368 hearings and was far more familiar with the issue of Leatherman's competence. The judge presiding at the assault trial had no such insight. Nonetheless, it does not appear the court engaged in any review of the evidence of Leatherman's mental condition other than her outbursts at trial in deciding not to order a hearing under section 1368. (See *People v. Ary* (2004) 118 Cal.App.4th 1016, 1018.) When the full record is examined, there is irrefutable and substantial evidence that required the court to declare a doubt as to her competence. Because a trial court has no jurisdiction to proceed with a case against a defendant without first determining his or her competence in a section 1368 hearing once such a doubt has arisen, we must conditionally reverse Leatherman's conviction for assaulting Hatamitabrizi.

On remand, the court must consider whether the record is sufficient to conduct a retrospective hearing pursuant to section 1368 as to Leatherman's competence during trial.  (See *People v. Lightsey* (2012) 54 Cal.4th 668, 710-711; *People v. Ary* (2011) 51 Cal.4th 510, 520.)  If such a hearing if feasible, the court must proceed to determine Leatherman's competence.  If she is found to have been competent, the aggravated assault conviction is to be reinstated; and we will thereafter consider her additional arguments on appeal.  If she is found to have been incompetent, her conviction must be vacated.  Similarly, if such a hearing is found not to be feasible on the record presented, the conviction must be reversed; and the People will have the right to retry Leatherman at a time when she is competent to stand trial.  (*Lightsey,* at p. 732.)[11]

c.  *The criminal threats no contest plea*

By the time the plea was taken in June 2013 Leatherman had spent nearly a year in psychiatric placements to restore her competency.  Throughout the hearing on the plea, Leatherman manifested the obsessive questioning described in some of the psychiatric reports.  Eventually, however, guided by a patient judge, she reached a level of understanding and comfort with the consequences of the proposed plea agreement.  Her longtime counsel did not declare a doubt as to her competence and allowed Leatherman to express her fears and frustrations to the court.  Leatherman remained compliant and mostly focused on the question of sentencing.  The record displays none of the agitation, hostility or delusional beliefs so apparent during the aggravated assault trial.  The court found Leatherman was aware of the consequences of the plea, and Leatherman agreed:  "I understood everything that happened.  I wanted to take the plea.  No one coerced me. . . .  [I]t's a setup to a very bad situation, but that's not a coercion.  I fully took the plea on my own."  After Leatherman had left, the court thanked defense counsel for her "extreme professionalism" and said, "[A]lthough Miss Leatherman's behavior was erratic

---

[11]     If Leatherman is found incompetent and the aggravated assault conviction is vacated, her contention she is entitled to withdraw her plea of no contest to the criminal threats charges due to a misrepresentation of available sentence credits is moot.  We will consider that contention if she is found to have been competent and the aggravated assault conviction is reinstated.

and the conversation rambling, she was, I believe, capable of understanding what her rights were and what her consequences were and was competent to plead no contest." Leatherman's counsel concurred. There was no abuse of discretion.

### 3. *Under the Circumstances, the Trial Court Did Not Abuse Its Discretion by Refusing To Instruct Pursuant to CALCRIM No. 3428 on the Stalking Charges; Defense Counsel's Failure To Designate the Necessary Expert Witness Was Not Ineffective Assistance of Counsel*

Evidence of mental disease, defect or disorder is admissible in the prosecution of a specific intent crime on the narrow issue whether the accused formed the required specific intent to accomplish the crime. (§ 28, subd. (a).) To commit the offense of stalking, a defendant must "willfully, maliciously, and repeatedly follow[] or willfully and maliciously harass[] another person and . . . make[] a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family . . . ." (§ 646.9, subd. (a).) Leatherman contends the trial court abused its discretion by failing to instruct the jury under CALCRIM No. 3428, a pinpoint instruction that allows the jury to consider whether the defendant actually formed the specific intent that is an element of the charged offense.[12] (See *People v. Blacksher* (2011) 52 Cal.4th 769, 832.)

The reasons for the court's decision to deny the requested instruction are clearly set out on the record. Defense counsel requested the instruction on the first day of trial. The court correctly observed expert testimony is necessary to provide a factual basis for the instruction (see *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1229-1230; *People v.*

---

[12] CALCRIM No. 3428 provides: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: *<insert specific intent or mental state required, e.g., 'malice aforethought,' 'the intent to permanently deprive the owner of his or her property,' or 'knowledge that . . . .>'* If the People have not met this burden, you must find the defendant not guilty of *<insert name of alleged offense>. . . .*"

*Larsen* (2012) 205 Cal.App.4th 810, 824), a requirement defense counsel did not dispute. As counsel explained, she had delayed designating an expert because Leatherman opposed relying on a mental defense. However, counsel had been advised by various clinicians who had evaluated Leatherman such a defense would be appropriate. Counsel then requested a continuance of the trial to allow her time to retain an expert who could provide the factual basis for the instruction. The court denied the request, noting there had been no material change of circumstances sufficient to warrant an additional evaluation; Leatherman was opposed; and it was not timely.

A continuance of a criminal trial may be granted only upon a showing of good cause. (§ 1050, subd. (e); *People v. Wilson* (2005) 36 Cal.4th 309, 352.) A decision to grant or deny a continuance of trial rests within the discretion of the trial court. (See, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1037; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1548.) There was no abuse of discretion. The matter had been pending more than two years, nearly a year of which had been consumed by competency proceedings. Leatherman had only recently returned from Patton after restoration of her competence. In light of the obvious fragility of her mental health, the court had ample reason to move forward with the trial.

We also reject Leatherman's claim her counsel provided ineffective assistance by failing to designate an expert to testify regarding her inability to form specific intent under section 646.9. Leatherman had been repeatedly evaluated for competence and, most recently, had been found competent. Counsel conceded she had long been deliberating whether to pursue a mental defense. Her delay, which she attributed to Leatherman's opposition to such a defense, was a trial tactic well within the scope of her ethical duty. (See *People v. Lang* (1989) 49 Cal.3d 991, 1031 ["[t]o require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client"]; *People v. Brown* (2014) 59 Cal.4th 86, 112 ["[a]fter having been advised by

31

counsel, if a competent defendant decides . . . to present no mitigating evidence, he cannot later label counsel ineffective for honoring the defendant's own wishes"].)

## DISPOSITION

The judgment entered on Leatherman's conviction for aggravated assault (Case No. B238552) is conditionally reversed, and the matter remanded to allow the trial court to determine whether a retrospective competency hearing is feasible to evaluate Leatherman's competence at the time of trial in May 2011. If a retrospective competency hearing is held and Leatherman is found to have been competent at the time of trial, the court must reinstate the judgment. If a retrospective competency hearing is held and Leatherman is found to have been incompetent at the time of trial or if the court determines a retrospective competency hearing is not now feasible, the judgment of conviction must be vacated; and the trial court must set the case for a new trial.

The judgment in Case No. B250175 is modified to reflect the court's imposition of one-third the middle term of three years on count 1 (§ 646.9, subd. (b)) and to stay imposition of the six month sentence on count 3 (§ 166, subd. (a)(4)). In all other respects the judgment in Case No. B250175 is affirmed.

The judgment in Case No. B250174 is affirmed.


PERLUSS, P. J.

We concur:


ZELON, J.


FEUER, J.[*]

---

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.